# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Prospect ECHN, Inc., | Case No. 19-cv-586 (SRN/ECW) |
| Plaintiff, | |
| v. | **ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION TO EXCLUDE EXPERT TESTIMONY** |
| Winthrop Resources Corporation, | |
| Defendant. | ~~*Temporarily Filed Under Seal*~~ |
| | Unsealed by the Court, November 2, 2021 |

Joshua A. Hasko, Messerli & Kramer PA, 100 S. 5th St., Ste. 1400, Minneapolis, MN 55402; David Dugan, Frank Peretore, and Robert L. Hornby, Chiesa Shahinian & Giantomasi PC, One Boland Dr., West Orange, NJ 07052; and Molly R. Hamilton Cawley, MHC Law, LLC, 460 King St., Ste. 200, Charleston, SC 29403, for Plaintiff.

Geoffrey L. Harrison, Susman Godfrey LLP, 1000 Louisiana St., Ste. 5100, Houston, TX 77002; Glenn Charles Bridgman, Susman Godfrey LLP, Ste. 1400, 1900 Avenue of the Stars, Los Angeles, CA 90067; and Matthew R. McBride and Quin C. Seiler, Winthrop & Weinstine, PA, 225 S. 6th St., Ste. 3500, Minneapolis, MN 55402, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on Plaintiff's Motion for Summary Judgment [Doc. No. 77], Defendant's Motion for Summary Judgment [Doc. No. 96], and Defendant's Motion to Exclude Expert Testimony from Paul Bent [Doc. No. 102]. For the reasons set forth below, Plaintiff's summary judgment motion is denied, Defendant's summary judgment motion is granted, and Defendant's Motion to Exclude Expert Testimony is denied as moot.

## I.      BACKGROUND

### A.      Factual Background

Defendant Winthrop Resources Corporation ("Winthrop") is a Minnesota corporation that leases computers and other electronic equipment to corporate customers. *See Winthrop v. Sabert Corp.*, 567 F. Supp. 2d 1084, 1086 (Minn. 2008).

#### 1.      Lease Agreement

In 2007, Plaintiff's predecessors Eastern Connecticut Health Network, Inc., Manchester Memorial Hospital, and Rockville General Hospital (collectively, "ECHN") entered into Lease Agreement Number EA112107 (the "Lease Agreement") with Winthrop.  (Bridgman Decl. [Doc. No. 99], Ex. 1 (Nov. 2007 Lease No. EA112107).) Plaintiff Prospect ECHN ("Prospect") is a Connecticut corporation that operates a network of hospitals.  (Compl. [Doc. No. 1] ¶ 5.)  In 2016, Prospect acquired the rights and obligations held by ECHN pursuant to the Lease Agreement.  (Kahn Decl. [Doc. No. 55] ¶ 4; *see also* Compl. ¶ 10.)

The Lease Agreement governed the leasing and installation of equipment and software, and the provision of technical support services from Winthrop, the lessor, to ECHN, the lessee, in accordance with various "Lease Schedules."[1]  (Bridgman Decl., Ex. 1 (Lease Agmt.) at 1.)  The Lease Schedules identified the specific equipment, software, and related services that Winthrop provided.  (*Id.*)

_____

[1]      The Court applies the labels "lessor" and "lessee" simply for ease of reference.  If the Lease Agreement and Lease Schedules are recharacterized as secured transactions, the "lessor" would be considered the "secured party" and the lessee the "debtor/obligor."

The Lease Agreement contains the following pertinent terms:

**Term—¶ 1**:  The term of this Lease Agreement, as to all Equipment on any particular Lease Schedule, shall commence on the Installation Date for all Equipment on such Lease Schedule and shall continue for an initial period ending that number of months from the  Commencement Date as set forth in such Lease Schedule (the "Initial Term") *and shall continue from year to year thereafter until terminated*.  The term of this Lease Agreement as to all Equipment designated on any particular Lease Schedule may be terminated without cause at the end of the Initial Term or any year thereafter by either party mailing written notice of its termination to the other party not less than one-hundred twenty (120) days prior to such termination date.

**Return to Lessor—¶ 7**:  On the day following the last day of the lease term associated with a Lease Schedule (the "Return Date"), Lessee [ECHN] shall cause and pay for the Equipment on that Lease Schedule to be deinstalled, packed using the manufacturer's standard packing materials and shipped to a location designated in writing by the Lessor (the "Return Location."). If the Equipment on the applicable Lease Schedule is not at the Return Location within ten (10) days of the Return Date, or Lessee [ECHN] fails to deinstall and ship the Equipment on the Return Date, then any written notice of termination delivered by Lessee [ECHN] shall become void, and the Lease Schedule shall continue in accordance with this Lease Agreement. . . .

**Ownership of the Equipment—¶ 9**:  The Equipment shall, at all times, be the sole and exclusive property of Lessor [Winthrop].  Lessee [ECHN] shall have no right or property interest therein, except for the right to use the Equipment in the normal operation of its business at the Location of Installation, or as otherwise provided herein. . . .

**Loss and Damage—¶ 12**:  Lessee shall  assume and  bear the risk  of loss,  theft and damage (including any  governmental  requisition, condemnation or confiscation) to the Equipment and  all component parts thereof from any and every cause whatsoever, whether or not covered by insurance. . . .  In the event that all or part of the Equipment shall,  as a result of any cause whatsoever, become lost, stolen, destroyed or otherwise rendered irreparably unusable or damaged (collectively, the "Loss") then Lessee shall, within ten (10) days after the Loss, fully inform Lessor in writing of such a Loss and shall pay to Lessor the following amounts: (i) the Monthly Lease Charges (and other amounts) due and owing under this Lease Agreement at the time of the Loss,  plus (ii) the original cost of the Equipment subject to the Loss multiplied by the "Percent of Original Cost."

> **Warranties, Disclaimers and Indemnity—¶ 15**: . . . THIS LEASE AGREEMENT IS A "FINANCE LEASE" AS THAT TERM IS DEFINED AND USED IN ARTICLE 2A OF THE UNIFORM COMMERCIAL CODE. . . .
>
> **Net Lease—¶ 27**: This Lease Agreement is a net lease and Lessee's [ECHN's] obligations to pay all Lease Charges and other amounts payable hereunder shall be absolute and unconditional[.] . . .

(*Id.* ¶¶ 1, 7, 9, 12, 15, 27) (emphasis added).

The italicized language, quoted above in Section 1, is an "evergreen" renewal clause, which provides that the lease does not automatically end after the expiration of the initial term, but renews yearly until it is terminated. (*Id.* ¶ 1); *see also Sabert Corp.*, 567 F. Supp. 2d at 1088 (describing identical language in Winthrop lease agreement as an "evergreen" clause, subject to automatic renewal unless terminated).

In addition, the Lease Agreement states that it is governed by Minnesota law, and reflects that it is a fully integrated document, constituting "the entire agreement" between the parties. (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 25.)

Winthrop and ECHN signed the Lease Agreement. (*Id.* at 6.) Although the parties also agreed to certain riders that modified some of the Lease Agreement's provisions, (Bridgman Decl., Ex. 2 (Riders)), none of the modifications affected the provisions of the Lease Agreement relevant to the parties' dispute.

### 2.   Lease Schedules and the Equipment

In addition to the Lease Agreement, the parties entered into seven Lease Schedules: Schedules B01, B02, 003X, 004X, C01, D01, D02. (Bridgman Decl., Ex. 3 (Lease Schedules).) The Lease Schedules state that they are "issued pursuant to [the] Lease

Agreement," and that "[t]he terms of the Lease Agreement . . . are a part hereof and are incorporated by reference herein." (*See, e.g., id.* at 1.)  The Lease Schedules identify the equipment subject to each schedule, the initial term of the schedule, and the monthly lease charge. (*See, e.g., id.* at 1–11.)  The commencement dates for the Lease Schedules ranged from October 2011 through June 2016, with initial lease periods ranging from four to five years. (*Id.* at 1, 12, 14, 19, 22, 26, 31; Jan. 22, 2021 Kahn Decl. [Doc. Nos. 92 & 93] ¶ 4.)  Winthrop and ECHN signed each of the Lease Schedules.  (Bridgman Decl., Ex. 3 (Lease Schedules) at 1, 11–14, 18–19, 21–22, 25, 27, 30–32.)

The equipment subject to the leases included computer software, hardware, and intangible "soft costs" for labor and services.  (Jan. 22, 2021 Kahn Decl. ¶ 3, Exs. B–I (Lease Schedules).)  Winthrop did not retain title to "soft costs" or to the software licenses, (Dugan Decl. [Doc. No. 81], Ex. A (Gendler Dep.) at 20), and generally placed zero residual value on those two categories of "equipment."  (*Id*. at 54, 137; Dugan Decl., Ex. B (Winthrop Residual Policy) at 1.)  As to the value of the hardware equipment at the end of a lease schedule's initial term, sometimes referred to as the equipment's "useful life," for multiple pieces of smaller equipment such as desktop computers or network storage, Winthrop's Rule 30(b)(6) deponent Paul Gendler testified that Winthrop would not analyze the residual value of such equipment at the time of entering into the lease schedule.  (Dugan Decl., Ex. A (Gender Dep. at 43–45.)  He could not point to any analyses of the residual value of the hardware for any of the Lease Schedules at issue here at the time the agreements were executed.  (*Id*. at 91–95, 103–04, 110, 115, 124–25, 131, 133–34.)  Gendler testified that Winthrop's evaluation of a potential lease agreement was credit-

driven and based on an "at-risk perspective," involving the length of the term and possibilities for equipment upgrades or changes.  (*Id.* at 40–46.)

Erik Carlsen, a former Winthrop sales representative who dealt with Prospect, testified that the length of the initial term in Winthrop's lease schedules was "always . . . based upon the underlying asset's useful life."  (Dugan Decl., Ex. L (Carlsen Dep.) at 39– 40.)  In email communications with Prospect, Carlsen referenced the American Hospital Association's depreciation manual ("AHA Manual") to determine the useful life of the equipment, which estimated a five-year useful life for desktop computers, disk drives, networking equipment, printers, and terminals, along with a three-year useful life for laptops and software.  (Dugan Decl., Ex. N (AHA Manual) at 2; *id.*, Ex. M (Carlsen/Ray emails).)  Responding to questions from James Ray, ECHN's Director of Accounting & Taxation, about the useful life of the equipment under a lease schedule, Carlsen stated, "The equipment on lease schedule number EA112107 has an estimated useful life of 5 years according to the [AHA Manual].  And, the Initial Term of the lease is as well 5 years. Therefore, the Initial Term is greater than 75% of the property's economic life.  Indeed, the Initial Term and the useful life are the same at 5 years.  Therefore, while we do not provide accounting and/or tax advice, it is possible to classify this transaction as a capital lease."  (Dugan Decl., Ex. M (Carlsen/Ray emails).)

Carlsen also communicated with ECHN's Lloyd Pelletier in November 2011 about the "residual recapture" of certain equipment, stating, "The residual recapture represents an amount related to equipment value that we had intended to receive at the end of the leases, but due to the costs accepted and the need to recast the leases, was realized as part

6

of Master Lease Schedule B and Lease Schedule B01." (Dugan Decl., Ex. O (Carlsen/Pelletier emails).) Pelletier then asked, "So this in essence then has zero $ at the end of the lease and resembles a $1 out lease?" to which Carlsen responded, "Correct. There is no anticipated value for this." (*Id.*)

For purposes of accounting for the residual value of the hardware equipment, Winthrop used a "Residual Policy" that recorded residual value at the inception of the lease at 12.5% of the equipment's original cost for leases with initial terms greater than 44 months, zero residual value for leases with initial terms greater than 63 months, and zero residual value for "tangible assets transferring to re-writes or extensions of existing schedules which will be more than 63 months old at the end of the successor lease." (Dugan Decl., Ex. A (Gendler Dep.) at 135–36; *id.*, Ex. B (Winthrop Residual Policy) at 1.) Applying the Residual Policy to the hardware under the Lease Schedules here, Prospect calculates the following residual values:

| Lease Schedule | % of Total Cost of Equipment is Hardware | Residual Value of Hardware in $ or % | Residual Policy Applied | Initial Term |
|---|---|---|---|---|
| B01 | 32% | $0.00 | Initial Term of 60 mos., with add'l payments for 29 mos., for a total of 89 mos. (i.e., over 63 mos.) | 10/1/11 to 9/1/16 |
| B02 | 47.4% | $0.00 | Initial Term of 60 mos., with add'l payments for 17 mos., for a total of 77 mos. (i.e., over 63 mos.) | 9/30/12 to 8/31/17 |

7

| 003X | 42.1% | $0.00 | Initial Term of 48 mos., with add'l payments for 17 mos., for a total of 64 mos. (i.e., over 63 mos.) | 10/1/13 to 9/30/17 |
| 004X | 42.2% | $0.00 | Initial Term of 48 mos., with add'l payments for 15 mons., for a total of 63 mos. (i.e., over 63 mos.) | 12/1/13 to 11/30/17 |
| C01 | 51.4% | 12.5% | Initial Term of 48 mos. | 2/1/15 to 1/31/19 |
| D01 | 84.1% | 12.5% | Initial Term of 48 mos. | 11/1/15 to 10/31/19 |
| D02 | 81.1% | 12.5% | Initial Term of 48 mos. | 6/1/16 to 5/2/20 |

(Pl.'s Summ. J. Mem. [Doc. No. 80] at 8) (citing Jan. 22, 2021 Kahn Decl. ¶¶ 10–17).

Paul Gendler, Winthrop's corporate representative, testified that at the time the parties entered into the largest lease schedule, Lease Schedule B01, "[Winthrop] expected we could do with the hardware what we commonly do with the hardware, which is to resell it." (Dugan Decl., Ex. A (Gendler Dep.) at 93.) Gendler further testified that "[t]here's a very robust resell market for this kind of equipment," and noted that between 2009 and 2019, with regard to healthcare equipment, "we were experiencing a lot of upgrades and midterm changes, which again, is where we add a lot of value, so we were getting a lot of equipment back [from lessees]." (*Id*. at 42–43.)

Winthrop delivered the equipment subject to the Lease Agreement and Lease Schedules. (Bridgman Decl., Ex. 5 (Fuss Dep.) at 60.) After receiving the equipment,

ECHN then executed Certificates of Acceptance, certifying that the equipment was received, was in good working order, was tested and inspected, was satisfactory in all respects, and was acceptable for use.  (*See, e.g.*, Bridgman Decl., Ex. 4 (Certif. of Acceptance) at 1.)  Certificates of Acceptance from January, May, June, July, November, and December 2014, and from March, May, July, August, September, October, and November 2015, state that "the Lease is intended by the parties to be a lease of Equipment to be owned by Winthrop [] and not a loan, sale or lease intended as a sale or loan."  (*See id*. at 110–69.)

At certain times during the negotiation of the seven Lease Schedules, ECHN asked Winthrop to offer a lease structure known as a "dollar buyout," through which the lessee has the option to purchase the leased equipment at the end of the initial term for $1.  (Gendler Decl. [Doc. No. 100] ¶ 19; Bridgman Decl., Ex. 6 (Kahn Dep.) at 232.)  As a general matter, Winthrop did not offer such leases at that time.  (Gendler Decl. ¶ 19.)  However, Lease Schedule D01 expressly provided that Prospect would own a portion of the equipment labeled as "Transferring Equipment" for consideration of $1 as of the commencement date.  (Jan. 22, 2021 Kahn Decl., Ex. H (D01 Lease Sched.) at 1, 3.)

### 3.    Payments and Negotiations

While Prospect initially honored the lease obligations after assuming ECHN's rights and obligations, in 2018, Prospect and Winthrop communicated about whether Prospect could be released from its payment obligations pursuant to the Lease Schedules on which the initial terms had expired.  (Jan. 22, 2021 Kahn Decl. ¶ 20.)  Prospect contends that as of March 2018, it had paid Winthrop a total of $7,918,532 in interim rent and payments

during and beyond the initial terms of Lease Schedules B01, B02, 003x, and 004x—an amount that was $1,746,044 in excess of the amounts paid and financed. (*Id*. ¶ 21.) At some point in approximately 2018, Prospect, through its former Senior Vice President of Finance and Development, Stewart Kahn, informally offered Winthrop's salesperson Jake Schwamb approximately $50,000 to $100,000 to be released from its obligations, but Kahn testified that Schwamb essentially "laughed off" the offer. (Bridgman Decl., Ex. 6 (Kahn Dep.) at 282–84; *see also* Jan. 22, 2021 Kahn Decl. ¶ 24.) In addition to this conversation, Prospect's CEO Michael Veillette and Schwamb exchanged preliminary emails on the subject of releasing Prospect from its payment obligations. (Jan. 22, 2021 Kahn Decl. ¶¶ 20–24.)

The record also reflects that Winthrop conveyed five separate written offers to Prospect. (Bridgman Decl., Exs. 8–12.) For example, in March 2018, Winthrop stated that Prospect could buy out its obligations under the B01 Lease Schedule for $1,767,278. (Jan. 22, 2021 Kahn Decl. ¶ 22, Ex. J.) But Prospect found the amount to be nearly $3.5 million in excess of what it had paid and financed during the initial term of the B01 Lease Schedule, and rejected Winthrop's offer. (*Id.* ¶ 22.) Later, in December 2018, Winthrop suggested that Prospect could pay $1.7 million to close out Lease Schedules B01, B02, 003x, and 004x collectively, but Prospect declined the offer. (*Id.* ¶ 23.) Prospect believed that any further discussions with Winthrop would be fruitless, particularly in light of "legal issues" involving ownership of the software, cables, wiring, and installation. (Bridgman Decl., Ex. 6 (Kahn Dep.) at 283–84.) Therefore, Prospect declined Winthrop's offers, and found that "it was time to start talking to our lawyers." (*Id*. at 280–81, 284.)

10

Prospect made full monthly payments under the terms of the Lease Agreement—in aggregate, $136,312 per month—through February 2019.  (Gendler Decl. ¶ 18.)  Prospect made a final partial payment on a charge subject to the Lease Agreement in June 2020. (*Id*.)

Although Prospect ceased making payments on the leased equipment, it does not dispute that as of November 2020, it was still using some of the equipment, and had not returned it.  (Bridgman Decl., Ex. 5 (Fuss Dep.) at 66, 68.)  With respect to some of the equipment, Prospect's National Vice President of Information and Technology, Andrew Fuss, stated that certain devices were broken, out of warranty, or Prospect had shredded them.  (*Id.* at 68–69, 76.)  Prospect's former financial executive, Kahn, testified that some of the licensor-owned software contained patient information that made the software non-returnable, Prospect believed, due to patient confidentiality laws.  (Bridgman Decl., Ex. 6 (Kahn Dep.) at 270.)  Prospect did not seek Winthrop's written permission to dispose of the equipment, nor did it inform Winthrop that it no longer had possession of certain equipment.  (*Id*.)  Winthrop's former CEO and President, Paul Gendler, confirmed that Winthrop did not give written or oral permission for Prospect to destroy, discard, or fail to maintain any of the leased equipment.  (Gendler Decl. ¶ 21.)

### B.    Procedural Background

In March 2019, Prospect filed this lawsuit against Winthrop, seeking a declaratory judgment that the Lease Agreement should properly be recharacterized as a secured financing agreement, rather than a lease.  (Compl. ¶¶ 78–84.)  Consistent with that recharacterization, it asserts a claim for breach of contract based on Winthrop's alleged

failure to return Prospect's security deposits under the Lease Schedules. (*Id.* ¶¶ 85–88.) Prospect also asserts a claim for breach of the implied covenant of good faith and fair dealing based on Winthrop's alleged failure to "relieve Prospect of its obligations under what is in substance a secured financing." (*Id.* ¶¶ 89–92.) In response, Winthrop denies the allegations, and asserts a counterclaim against Prospect for breach of contract. (Counterclaim [Doc. No. 9] ¶¶ 23–27.)

As noted, both parties now move for summary judgment. Prospect argues that pursuant to the Uniform Commercial Code's ("UCC") bright-line test as well as a contextual analysis, the Lease Agreement and Lease Schedules are all security interests, which relieves it of any further payment obligations to Winthrop. (Pl.'s Summ. J. Mem. at 11–27.) Accordingly, Prospect seeks a declaratory judgment that recharacterizes the Lease Agreement and Lease Schedules as security interests, as well as an award of damages on its breach of contract claim or its claim for breach of the implied covenant of good faith and fair dealing, and the dismissal of Winthrop's counterclaim. (*Id.* at 23–27.)

For its part, Winthrop argues that it is undisputed that Prospect breached the Lease Agreement and applicable Lease Schedules, and it cannot avoid the consequences of its breach by improperly recharacterizing the agreements as security interests. (Def.'s Summ. J. Mem. [Doc. No. 98] at 8–22.) Therefore, it moves for an award of damages and the dismissal of Prospect's claims. (*See id.* at 22–31.) In addition, Winthrop seeks to exclude the opinions offered by Plaintiff's expert, Paul Bent, on recharacterization of the lease, "buyouts," and his criticisms of provisions of the Lease Agreement. (Def.'s Mem. Supp. Mot. to Exclude ("Def.'s *Daubert* Mem.") [Doc. No. 104] at 3–27.)

## II.    DISCUSSION

### A.    Summary Judgment

#### 1.    Standard of Review

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016).  And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Although the moving party bears the burden of establishing the lack of a genuine issue of fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  *Krenik v. Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

### 2.      Contract Interpretation

As a preliminary matter, there is no dispute that Minnesota law applies to the interpretation of the Lease Agreement and Lease Schedules.  (Bridgman Decl., Ex. A (Lease Agmt.) ¶ 25) ("This Lease Agreement, the Lease Schedule(s), attached riders and any documents or instruments issued or executed pursuant hereto . . . shall be governed by the internal laws . . . and decisions of, the State of Minnesota.").  Because a lease is a form of contract, courts applying Minnesota law construe lease agreements consistent with general principles of contract construction.  *RAM Mut. Ins. Co. v. Rohde*, 820 N.W.2d 1, 14 (Minn. 2012) ("[L]eases are contracts to which we apply general principles of contract construction."); *Snyder's Drug Stores, Inc. v. Sheehy Prop., Inc.*, 266 N.W.2d 882, 884 (Minn. 1978) ("[L]eases should be interpreted no differently than other writings; that is, leases should be construed so as to give effect to the intention of the parties.");

When construing a contract under Minnesota law, a court's "primary goal . . . is to determine and enforce the intent of the parties." *Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 818 F.3d 356, 361 (8th Cir. 2016) (quoting *Motorsports Racing Plus, Inc. v. Arctic Cat Sales, Inc.*, 666 N.W.2d 320, 323 (Minn. 2003)).  Where the contracting parties' intention is ascertainable from the language of a written contract, the construction of the contract is for the court.  *Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990).  If the parties' intent is unambiguously expressed, "[t]he language found in a contract is to be given its plain and ordinary meaning." *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 67 (Minn. 1979); *Bass v. Ring*, 9 N.W.2d 234, 236 (Minn. 1943)).  While courts apply the plain and ordinary meaning of contractual terms to the interpretation

of a contract, those terms are construed in the context of the entire contract. *Quade v. Secura Ins.*, 814 N.W.2d 703, 705 (Minn. 2012) (citing *Emp'rs Mut. Liab. Ins. Co. of Wis. v. Eagles Lodge of Hallock, Minn.*, 165 N.W.2d 554, 556 (Minn. 1969)). The interpretation of unambiguous contractual language is a question of law for the Court. *See Staffing Specifix, Inc. v. TempWorks Mgmt. Servs., Inc.*, 913 N.W.2d 687, 692 (Minn. 2018).

"A contract is ambiguous if, based on the language alone, it is reasonably susceptible of more than one interpretation." *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). "If there is ambiguity, extrinsic evidence may be used, and construction of the contract is a question of fact for the jury unless such evidence is conclusive." *Hickman v. SAFECO Ins. Co. of Am.*, 695 N.W.2d 365, 369 (Minn. 2005) (citing *Donnay v. Boulware*, 144 N.W.2d 711, 716 (Minn. 1966)). While ambiguity in a contract can be construed against the drafter, *see, e.g., Staffing Specifix*, 913 N.W.2d at 693, courts should do so only after attempting to "determine the parties' intent behind an ambiguous term, using extrinsic evidence if available." *Id.* at 694. Moreover, "this rule has less application as between parties of equal bargaining power or sophistication," *Re-Sols. Intermediaries, LLC v. Heartland Fin. Grp., Inc.*, No. A09-1440, 2010 WL 1192030, at *3 (Minn. Ct. App. Mar. 30, 2010), and where both parties are represented by sophisticated legal counsel during the formation of the contract. *Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 960 (8th Cir. 2000).

As a general matter, Minnesota upholds principles of freedom of contract, in which "parties are generally free to allocate rights, duties, and risks," *Lyon Fin. Servs. v. Ill. Paper & Copier Co.*, 848 N.W.2d 539, 545 (Minn. 2014), and "[c]ourts are not warranted

in interfering with the contract rights of parties as evidenced by their writings which purport to express their full agreement." *Cady v. Bush*, 166 N.W.2d 358, 362 (Minn. 1969).

The Court finds that the Lease Agreement here is unambiguous.  As a general matter, it permits termination at the end of the initial lease term, subject to certain notice requirements and the return of equipment, but if a party does not terminate at that time or return the equipment, the evergreen provision renews the lease for another year.  (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶¶ 1, 7.)  Other judges in this District have found the same language in a Winthrop lease unambiguous.  *Sabert Corp*., 567 F. Supp. 2d at 1093 ("When read as a whole, the Lease and the schedules are unambiguous on this point:  The Lease runs for an Initial Term of forty-two months from the Commencement Date, after which the Lease automatically renews each year until it is terminated by one or both of the parties."); *Winthrop Res. Corp. v. Advanced Telecomm of Pittsburgh*, No. 01-cv-640 (JEL/JGL), 2002 WL 31777799, at *6 (D. Minn. Dec. 10, 2002) ("Section 1 of the Agreement must be enforced according to the plain meaning of its clear and unambiguous terms.").

### 3.  Lease or Security Interest

The threshold question here is whether the Lease Agreement and related Lease Schedules are "true leases," as Winthrop argues, or subject to recharacterization as security interests, as Prospect argues.  The resolution of this question impacts the disposition of the parties' claims.  If the agreements are recharacterized as security interests, Prospect is the owner of the equipment, it argues, and Winthrop must return certain security deposits and

excess payments.[2]   But, on the other hand, if the parties' agreements are true leases, Winthrop is the owner of the equipment in question, it contends, and Prospect is obliged to honor the terms of the agreements.   Accordingly, the Court begins its analysis of the parties' motions by addressing whether the Lease Agreement is a true lease or a security interest.

A security interest is "an interest in personal property or fixtures which secures payment or performance of an obligation,"  Minn. Stat. § 336.1-201(b)(35), while a lease

---

[2]   Prospect argues that the legal characterization of the Lease Agreement and Lease Schedules is dispositive," because "when a transaction is deemed a security interest, the lessee is deemed to have been the legal owner from the outset."  (Pl.'s Reply at 5) (citing *In re Lasting Impressions Landscape Contractors, Inc.*, 579 B.R. 43, 51–52 (Bankr. D. Md. 2017), and *In re Worldcom, Inc.*, 339 B.R. 56, 72 (Bankr. S.D.N.Y. 2006)).

Winthrop disputes that recharacterization has this effect, noting that Prospect's legal authority does not arise under the U.C.C., but under bankruptcy law, with its attendant concerns about priority of creditors, which are not implicated here.  (*See* Def.'s Summ. J. Mem. at 20–21; Def.'s Opp'n [Doc. No. 122] at 20–23.)  Also, Winthrop argues that even under the U.C.C., Minn. Stat. § 336.1-302(a), "the effect of provisions of the [U.C.C.] may be varied by agreement," (Def.'s Summ. J. Mem. at 21–22; Def.'s Opp'n at 16), and the inclusion of the evergreen clause is one such term that the parties were free to add.  (Def.'s Summ. J. Mem. at 21–22.)

But Plaintiff argues, following Defendant's logic, if the Lease Agreement were recharacterized as a security interest—under which Plaintiff would own the equipment— then Defendant could contract around Minn. Stat. § 336.1-203 by requiring Plaintiff to nevertheless continue to make payments, rendering the U.C.C. meaningless.  (Pl.'s Reply [Doc. No. 124] at 7, 10 (stating, "To suggest a security agreement can act as a 'lease' even though it's just been declared not to be a lease—is just the type of end-run around 1-203 that courts have repeatedly rejected."); *see also* Pl.'s Opp'n [Doc. No. 113] at 15–23.)

Because the Court ultimately finds that the Lease Agreement and Lease Schedules were leases, as addressed herein, it does not reach the issue of whether the opposite conclusion would result in the relief that Plaintiff seeks.

17

is a transfer of the right to possession and use of goods for a term, in return for consideration. Minn. Stat. § 336.2A.103(j). The two types of agreements are distinctive instruments, such that "a sale . . . or retention or creation of a security interest is not a lease." *Id*. However, the U.C.C. permits courts to recharacterize an agreement that is labeled a lease as a security interest, under certain circumstances. Minn. Stat. § 336.1-203.

Regardless of the label, courts are to consider whether an agreement is a true lease or whether it is a security interest based on the facts of each case. Minn. Stat. § 336.1-203(a). Thus, while the Lease Agreement here is labeled a "lease" and self refers to a "lease," and the Lease Schedules refer to "leases," the Court must look to the substance of the parties' agreement. *See James Talcott, Inc. v. Franklin Nat'l Bank of Minneapolis*, 194 N.W.2d 775, 779 (1972) (noting that when determining whether an agreement is a lease or a security interest, courts consider the substance of the agreement, rather than its form).

Under the U.C.C., courts apply an objective "bright-line test" to determine whether an agreement in the form of a lease is an actual lease versus a security interest. *See* Minn. Stat. § 336.1-203(b). If, after applying the bright-line test, the agreement is deemed a lease, some courts have undertaken an additional analysis of the "economic realities" underlying the parties' agreement to determine whether it is properly characterized as a lease or a security interest. *See In re Pillowtex, Inc.*, 349 F.3d 711, 719 (3d Cir. 2003) (stating that if none of the U.C.C. factors are present, courts are to consider the economic reality of the transaction); *In re Ecco Drilling Co., Ltd*, 390 B.R. 221, 227–28 (Bankr. E.D. Tex. 2008) (noting that if the agreement is found to be a lease after applying the bright-line test, the

inquiry comes to an end).  The party seeking recharacterization of a lease bears the burden of proof to establish that the agreement is not a true lease.  *In re Pillowtex*, <u>349 F.3d at 716</u>.

### a.     Bright-Line Test

The "bright-line test" for whether a lease is a true lease or a security interest is codified in Minnesota's U.C.C. and "is determined by the facts of each case."  Minn. Stat. § 336.1-203(a).  The test consists of two parts.  First, a transaction in the form a lease creates a security interest "if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease and is not subject to termination by the lessee."  Minn. Stat. § 336.1-203(b).  Second, one of four other factors must be present:

> (1) the original term of the lease is equal to or greater than the remaining economic life of the goods;
>
> (2) the lessee is bound to renew the lease for the remaining economic life of the goods or is bound to become the owner of the goods;
>
> (3) the lessee has an option to renew the lease for the remaining economic life of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement; or
>
> (4) the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement.

*Id.*

Commentators to the U.C.C. have observed that "All of these tests focus on economics, not the intent of the parties."  *Id.*, U.C.C. Comment, n.2; *see also Lyon Fin. Servs., Inc. v. Ill. Paper & Copier Co.*, <u>247 F. Supp. 3d 923, 934</u> (N.D. Ill. 2017) ("Again, the parties' intent, though normally of central importance in contract law, is not relevant to

the determination of whether an agreement is a secured transaction or a lease under the Uniform Commercial Code.").

The statute also makes clear that a transaction does not create a security interest merely because it provides that

(1) the present value of the consideration the lessee is obligated to pay the lessor for the right to possession and use of the goods is substantially equal to or is greater than the fair market value of the goods at the time the lease is entered into;

(2) the lessee assumes risk of loss of the goods;

(3) the lessee agrees to pay, with respect to the goods, taxes, insurance, filing, recording, or registration fees, or service or maintenance costs;

(4) the lessee has an option to renew the lease or to become the owner of the goods;

(5) the lessee has an option to renew the lease for a fixed rent that is equal to or greater than the reasonably predictable fair market rent for the use of the goods for the term of the renewal at the time the option is to be performed; or

(6) the lessee has an option to become the owner of the goods for a fixed price that is equal to or greater than the reasonably predictable fair market value of the goods at the time the option is to be performed.

Minn. Stat. § 336.1-203(c)(1)–(6).

Winthrop argues that Prospect fails to first demonstrate the preliminary element necessary for a security interest, namely, that it lacked the right of termination. Minn. Stat. § 336.1-203(b)(1) (stating that an agreement in the form of a lease creates a security interest "if the consideration that the lessee is to pay the lessor for the right to possession and use of the goods is an obligation for the term of the lease *and is not subject to termination by the lessee*) (emphasis added). It also contends that Prospect fails to establish the first and

20

fourth factors under § 336.1-203(b), which Prospect invokes in support of its position that the Lease Agreement is a disguised security interest.

### i.     Lessee's Right of Termination

Section 1 of the Lease Agreement provides, "The term of this Lease Agreement as to all Equipment designated on any particular Lease Schedule *may be terminated without cause at the end of the Initial Term or any year thereafter*. . . ."  (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 1) (emphasis added).  Thus, while Prospect was obliged to make payments for the initial term of the lease, it was free to terminate at the end of the initial term, and on a yearly basis thereafter.  The question is whether the "term of the lease" under Minn. Stat. § 336.1-203 applies solely to the initial term of a lease, or, in the case of a lease with an evergreen clause, to the automatically renewed term as well.

Prospect notes that some courts have interpreted the lessee's lack of ability to terminate "for the term of the lease" as the inability to terminate during the *initial term*. (Pl.'s Opp'n [Doc. No. 113] at 7) (citing *In re Pillowtex*, 349 F.3d at 717; *In re Ecco Drilling Co.*, 390 B.R. at 227).   And it argues that because the Lease Agreement here contains a "hell or high water" clause making payment "absolute and unconditional," Prospect had no termination rights.  (*Id.*)   The case law, however, is not so clear.  Indeed, the court in *In re Pillowtex* interpreted the phrase "for the term of lease" as the lessee's inability to terminate during the initial lease term, 349 F.3d at 717, but the lease in question did not have an automatic renewal provision, as the Lease Agreement does here.  The lease in *In re Ecco Drilling* permitted the lessee to terminate after the initial term, but there, "the parties *agree[d]* that the referenced documents d[id] not permit [the lessee] to terminate its

payment obligations under the lease prior to the expiration of the lease term." 390 B.R. at 224, 228 (emphasis added). There is no such agreement between the parties here. The court in *In re Triplex Marine Maintenance, Inc.*, cited the agreement's "hell or high water" provision that prohibited the lessor/debtor from canceling, and found that the first bright-line factor was satisfied because the lessee/debtor was unable to terminate the agreement prior to the conclusion of all payments. 258 B.R. 659, 669–70 (Bankr. E.D. Tex. 2000) (quoting the agreement, which stated, "[Y]ou [the Debtor] agree that [the agreement] will continue for the full term [of the lease] and any extension term.").

The Court is unaware of Minnesota authority that addresses whether "for the term of the lease" under Minn. Stat. § 336.1-203(b) extends to lessees' termination rights beyond the initial lease term. In *Sabert Corporation*, 567 F. Supp. 2d at 1093, the court interpreted the same Winthrop lease-term language at issue here, albeit in the context of determining the termination date, and stated, "The fact that the *initial term* of the Lease is forty-two months does not change the fact that the Lease automatically renews each year. When read as a whole, the Lease and the schedules are unambiguous on this point: The Lease runs for an Initial Term of forty-two months from the Commencement Date, after which the Lease automatically renews each year until it is terminated by one or both of the parties."

The U.C.C. itself sheds some light on the interpretation of the "term of the lease," as it distinguishes between the words "term" and "original term" in the provision of the statute directly at issue:

> (b) A transaction in the form of a lease creates a security interest if the
> consideration that the lessee is to pay the lessor for the right to possession

and use of the goods is an obligation *for the term of the lease* and is not subject to termination by the lessee, and,

> (1) the *original term* of the lease is equal to or greater than the remaining economic life of the goods

Minn. Stat. § 336.1-203(b)(1) (emphasis added).  This suggests that a lessee's inability to terminate "for the term of the lease" extends beyond the initial lease term in order for the agreement to create a security interest, as the Minnesota Supreme Court has instructed, "When the Legislature uses different words, we normally presume that those words have different meanings." *Nelson v. Schlener*, 859 N.W.2d 288, 294 (Minn. 2015).

Considering this language, and reading the Lease Agreement as a whole, the Court finds that Prospect had the right of termination during the "lease term," as that term is broadly construed under the evergreen clause.  (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 1.) Accordingly, the Court finds that Plaintiff has failed to satisfy the threshold requirement in Minn. Stat. § 336.1-203(b) necessary to recharacterize the Lease Agreement as a security interest.

### ii.    Remaining Factors at Issue

Even if Prospect were to establish the threshold requirement, however, it would still need to demonstrate one of the four factors under Minn. Stat. § 336.1-203(b)(1)-(4). Prospect invokes the first and the fourth factors, which concern the remaining economic life of the goods and whether the lessee has the option to own the goods at the end of the lease term.

### (a) Remaining Life of the Goods

With respect to the first factor, § 336.1-203(b)(1) provides that a transaction in the form of a lease may create a security interest if, among other things, "the original term of the lease is equal to or greater than the remaining economic life of the goods."  In *Med-Depot, Inc. v. Farnam Street Financial, Inc.*, No. 12-cv-350 (PAM/SER), 2012 WL 13027410, at *3 (D. Minn. Oct. 11, 2012), the court observed that for a transaction to be a disguised security transaction under the U.C.C., "the term of the lease must 'swallow the entire value of the product.'" (citing *TFG-Ill., L.P. v. United Maint. Co.*, 829 F. Supp. 2d 1097, 1124 (D. Utah 2011); *In re HB Logistics, Inc.*, 460 B.R. 291, 306 (Bankr. N.D. Ala. 2011) (applying Minnesota law and finding that lease with 20% residual value at end of lease term is a true lease, not a security arrangement)).  Thus, in *Med-Depot*, because the court found that nearly 30% of the value of the leased equipment retained economic life, it found that the agreement in question was a lease.  *Id.*

As noted, the Lease Schedules here covered three types of equipment:  (1) software; (2) hardware; and (3) soft costs for services and installation.  (Jan. 22, 2021 Kahn Decl. ¶ 3 & Exs. B–I (Lease Schedules).)  Prospect argues that the original and extended terms of the Lease Schedules were equal to or greater than the remaining economic life of all of these items.  (Pl.'s Summ. J. Mem. at 14–17.)  Because Winthrop held no title or license to the software, and the services involved little residual value, Prospect focuses on the hardware, and Winthrop responds to its arguments in kind.  The hardware here included a variety of computer-related equipment such as personal computers, monitors, cables, scanners, batteries, and adapters.  (*See, e.g.*, Bridgman Decl., Ex. 3 (Lease Schedules).)

The U.C.C. provides that the "remaining economic life of the goods" is to be determined "with reference to the fact and circumstances at the time the transaction is entered into." Minn. Stat. § 336.1-203(e). Prospect contends that the four-year terms of the Lease Schedules exceeded the useful life of the goods once the Lease Schedules renewed past their initial terms. It cites U.C.C. comments providing that "with each renewal of the lease, the facts and circumstances at the time of each renewal must be examined . . . as it is possible that a transaction that first creates a lease, later creates a security interest." 20D Minn. Prac., Bus. Reg. in Minnesota—Stat. 336.2A-103 (2020 ed.) (quoting comments to U.C.C. § 2A-103).

In support of Prospect's argument, it states that Winthrop's own Residual Policy provides for zero residual value for any "tangible assets transferring to re-writes or extensions of existing schedules which will be more than 63 months old at the end of the successor lease." (Pl.'s Summ. J. Mem. at 14–17) (citing Dugan Decl., Ex. B (Winthrop Residual Policy) at 1.) As set forth earlier, *supra* at 7–8, Plaintiff applies Winthrop's Residual Policy to the hardware equipment subject to the seven Lease Schedules here and calculates a residual value of, at most, 12.5% under Lease Schedules C01, D01, and D02, and zero value for the four preceding Lease Schedules. (Dugan Decl., Ex. B (Winthrop Residual Policy) at 1.) Plaintiff also points to testimony from Winthrop's former account representative, Erik Carlsen, that the lease terms were tied to the useful life of the equipment, (Dugan Decl., Ex. L (Carlsen Dep.) at 39–40), and that Carlsen relied on the AHA Manual to determine the useful life of the equipment. (Dugan Decl., Exs. N (AHA Manual) & M (Carlsen/Ray emails); Jan. 22, 2021 Kahn Decl. ¶¶ 10–17, Exs. B-I.)

In addition, Prospect notes that Winthrop fails to offer any rebuttal expert testimony to support a different appraisal for the lifespan of the goods.  But Defendant asserts that Plaintiff's own appraisal expert, Ed Castagna, found the economic life of some of the equipment was longer than the initial terms for five out of the seven Lease Schedules, e.g., Lease Schedules 003X, 004X, C01, D01, and D02.  (Castagna Rpt. [Doc. No. 81-7] at 36–44; *see also* Bridgman Decl., Ex. 31 (Castagna Dep.) at 105–06.)  In response, Castagna acknowledges that the hardware on those four-year schedules had a potential useful life of one year beyond the initial terms, but "given the type of equipment included in the schedule, the anticipated time for repossessing, refurbishing, and reselling, and the fact that the equipment was used in the healthcare industry (and thus possibly came into contact with protected health information), the hardware had a negligible, if any, practical life and thus no practical value at the end of the terms."  (Castagna Decl. [Doc. No. 118] ¶ 10.)  Further, he states, the hardware on those Lease Schedules would have no value after five years.  (*Id.*)

Although Winthrop did not obtain a rebuttal appraisal opinion, Paul Gendler, Winthrop's corporate representative, testified that at the time the parties entered into the first and largest Lease Schedule, Lease Schedule B01, "[Winthrop] expected we could do with the hardware what we commonly do with the hardware, which is to resell it."  (Dugan Decl., Ex. A (Gendler Dep.) at 93.)  Gendler further testified that "[t]here's a very robust resell market for this kind of equipment," and noted that between 2009 and 2019, with regard to healthcare equipment, "we were experiencing a lot of upgrades and midterm

changes, which again, is where we add a lot of value, so we were getting a lot of equipment back [from lessees]."  (*Id*. at 42–43.)

Finally, Prospect admits that it is still using some of the equipment, years after the expiration of the initial terms.  (Bridgman Decl., Ex. 5 (Fuss Dep.) at 66) (testifying in November 2020 that Prospect is still using access points, personal computers, and possibly materials in the data center).  Its conduct belies the notion that the economic life of the goods expired at the end of the initial terms or the extended terms.  Instead of returning the purportedly worthless equipment, Prospect retained it and continued making payments in the "ordinary course."  (Bridgman Decl., Ex. 30 (Kahn Dep.) at 212.)

For all of these reasons, the Court finds that Prospect has not met its burden with respect to establishing this element.

### (b) Lessee's Ownership Option

Prospect also invokes the fourth factor under Minn. Stat. § 336.1-203(b):  "the lessee has an option to become the owner of the goods for no additional consideration or for nominal additional consideration upon compliance with the lease agreement."  Minn. Stat. § 336.1-203(b)(4); *see also FBS Bus. Fin. Corp. v. Edison Fin. Grp., Inc.*, 464 N.W.2d 304, 305 (Minn. Ct. App. 1990) (finding that purported lease that gave the lessee ownership or the option of owning the property for no consideration or nominal consideration, among other things, was a security-interest agreement).  It points to Lease Schedule D01, which contains specifically identified "Transferring Equipment" that Prospect could purchase for $1, provided it complied with its lease obligations.  (Pl.'s Summ. J. Mem. at 17–18.)

Except for this single reference to the specifically identified Transferring Equipment, however, the Lease Agreement and Lease Schedules contain no other provisions for Prospect to become the owner of the goods for no additional consideration or for nominal consideration. To the contrary, the Lease Agreement unambiguously calls for the return of the equipment to Winthrop. (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶¶ 7, 12), and the fact that Lease Schedule D01 specifically identifies certain Transferring Equipment supports a reading that the overall agreement contemplated that Winthrop retained ownership of the equipment. *See Chergosky*, 463 N.W.2d at 526 ("Because of the presumption that the parties intended the language used to have effect, we will attempt to avoid an interpretation of the contract that would render a provision meaningless.").

In sum, the Court finds that Prospect has not met its burden of showing that it lacked the right to terminate the Lease Agreement and related Lease Schedules, and it has not established either the first or fourth factor under § 336.1-203(b). Accordingly, the Court finds that Prospect has failed to satisfy the bright-line test for recharacterizing the Lease Agreement as a security interest.

### b.      Economic Realities

Prospect argues that if it fails to satisfy the bright-line test in the first instance, the Court must then conduct a "contextual analysis" to look at the specific facts of the case to determine whether the economic realities of the transaction suggest that it was a disguised security interest, rather than a lease. (Pl.'s Summ. J. Mem. at 18–19.) The Court is unaware of Minnesota authority requiring additional analysis separate from the U.C.C.'s bright-line test and its general guidance to examine the "facts of each case." Minn. Stat. § 336.1-

28

203(a).  Nonetheless, it will undertake what Prospect calls a "contextual analysis," and what other courts have referred to as an examination of the "economic realities" of the Lease Agreement and Lease Schedules to see if they suggest that the agreement was a security interest.  *See In re Grubbs Const. Co.*, 319 B.R. 698, 716 (Bankr. M.D. Fla. 2005) (applying economic realities test).

The Court notes that certain factors under the "economic realities" analysis appear to have been applied by courts prior to the 1987 U.C.C. amendments, which include the provisions of Minn. Stat. § 336.1-203.  *Id.* (referring to the test as having been used by courts deciding cases under the "Old U.C.C.").  Many of the factors are duplicative of the U.C.C. factors.  *See In re Pillowtex*, 349 F.3d at 719 (stating that factors relevant to evaluating the economic reality of the transaction include whether the purchase option is nominal, whether the lessee's aggregate payments have a present value equaling or exceeding the original cost of the leased property, and whether the term of the lease covers the useful life on the equipment).

The Court will not repeat its analysis of duplicative factors in detail, but its prior discussion applies equally here.  As noted earlier, Winthrop retained a reversionary interest, as the Lease Agreement and Lease Schedules generally contained no purchase option, and certainly no overall purchase option, Defendant submitted testimony showing that it resold computer hardware during the relevant time period, and Plaintiff continues to use some of the purportedly valueless equipment.

Courts examining the economic realities also frequently consider whether it would have been economically sensible for the lessee to purchase the equipment at the end of the

lease, *see In re Grubbs*, 319 B.R. at 716 (stating, "the Economic Realities Test requires an analysis of all terms and conditions of a purported lease transaction to determine whether the lessee has no sensible alternative other than to exercise the purchase option), or whether the lessee was obliged to purchase the equipment. *See also Carlson v. Tandy Computer Leasing*, 803 F.2d 391, 396 (8th Cir. 1986) (finding, in a pre-U.C.C. amendment case, that the agreement was a lease, noting, "Brock did not even have an option to purchase the computer equipment, let alone an absolute duty.  To the contrary, the agreement specifically required Brock to return the equipment to Tandy at the conclusion of the lease.").   Here, however, the Lease Agreement contains neither an overall option nor an obligation for the lessee to purchase the equipment.

Winthrop argues that Prospect ignores the "economic reality" that required Prospect to  pay Casualty Loss Value ("CLV") if the equipment is lost or destroyed.  (Def.'s Opp'n [Doc. No. 122] at 33–34.)   Indeed, pursuant to the Lease Agreement, the CLV of the equipment never falls below 22.4% of the original cost of the equipment, even after the initial term.  (*See* Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 12.)  Plaintiff's expert Mr. Bent testified that in "any lease intended as security, the casualty loss value should drop to zero by the end of the original term," and "the one [thing] it would not include is residual value. This deal included residual value and . . . I'm saying it should not have included residual value."  (Bridgman Decl., Ex. 21 (Bent Dep.) at 88.)   Citing Mr. Bent's testimony, Winthrop argues that the fact that the CLV did not drop to zero supports its reading of the

Lease Agreement as a lease.[3]   (Def.'s Opp'n at 33–34.)  The Court does not find this testimony, or the presence of a CLV clause in general, particularly meaningful under the economic realities analysis.  Mr. Bent merely opined as to what one would expect to find in a lease versus a security interest.

In addition, with respect to personal computers subject to the Lease Agreement, at the outset, it was economically beneficial for Prospect to lease the equipment, rather than buy it.  Michael Veillette, Senior Vice President of Finance & Information Services, stated, "it [d]oes not make sense for us to own these at the end," and therefore Prospect decided to lease personal computers through Winthrop by "doing operating leases, not capital leases."  (Bridgman Decl., Ex. 15 (Veillette/Broadbent emails).)   Others at Prospect acknowledged that the leasing arrangement with Winthrop resulted in lower payments during the lease, and it would not own the equipment at the end of the lease.  (Bridgman Decl., Ex. 23 (Covin/Cerrato emails) (stating, "Winthrop won't do a $1 buy-out lease, only Fair Market Value – that results in lower payments during the lease but we don't own the equipment at the end. . . .  I am talking to other lessors.").)

---

[3]     Winthrop does not appear to rely on the 22.4% CLV of the equipment as a proxy for its residual value.  In *Winthrop Resources Corp. v. Eaton Hydraulics, Inc.*, 361 F.3d 465, 471–73 (8th Cir. 2004), the Eighth Circuit considered the propriety of Winthrop's CLV clause as a measure of damages.  While it found it a proper means of calculating liquidated damages, the court stated, "the CLV provision is clearly not a fair-market value calculation," because it "presumably includes Winthrop's liability for buying the computer equipment, any damage or loss of the equipment, and other reasonable considerations." *Id*.

Thus, to the extent that analysis of the economic realities of the Lease Agreement is required, the Court finds that it supports the conclusion that the Lease Agreement was a lease, not a security interest.

In sum, the Court finds that under the bright-line test and an analysis of the economic realities of the Lease Agreement, Plaintiff has not shown that the Lease Agreement and Lease Schedules are security interests.[4]

Accordingly, the Court denies Plaintiff's motion for summary judgment as to recharacterization.

### 4. Breach of the Implied Covenant of Good Faith and Fair Dealing

Even if the Lease Agreement and Lease Schedules could be recharacterized as security interests, which might allow Prospect to affirmatively assert claims of bad faith or

---

[4]   Winthrop also asserts that Prospect's argument to recharacterize the Lease Agreement as a secured transaction in order to recover monthly lease charges and security deposits is subject to waiver and estoppel. (Def.'s Summ. J. Mem. at 31–33.) By continuing to make payments knowingly and voluntarily under the Lease Schedules, Winthrop contends that Prospect's request for a refund fails. (*Id.*) Prospect, however, contends that equitable estoppel is inapplicable because recharacterization involves a legal change in the characterization of the agreement, effective at the time the parties signed the contract. (Pl.'s Opp'n at 13–14) (citing *In re Gateway Ethanol, L.L.C.*, 415 B.R. 486, 500 (Bankr. D. Kan. 2009)).   Accordingly, Plaintiff argues, its payments beyond the initial terms of the Lease Schedules are irrelevant. (*Id.*)  Further, Prospect argues that waiver— the intentional relinquishment of a known right—is also inapplicable because waiver is inherently intent-based, and the relevant provision of the U.C.C., Section 1-203 (Minn. Stat. § 336.1-203), is not intent-driven.  While the Court finds Prospect's arguments persuasive, because the Court concludes that the Lease Agreement and Lease Schedules are leases, it need not reach this issue.

a bad faith defense, the record fails to show any conduct in bad faith on the part of Winthrop.

Prospect alleges that Winthrop breached the implied covenant of good faith and fair dealing by, among other things, "failing . . . to even accept a reasonable sum, [and] instead levying continued monthly purported lease renewals in what could be in perpetuity due to Winthrop's bad faith, unreasonable failure to negotiate." (Compl. ¶ 91.) Further, Prospect argues that as part of its business model, Winthrop "misled Prospect into believing that the Schedules were Fair Market Value (FMV) 'leases.'" (Pl.'s Opp'n at 38.) Prospect contends that Winthrop's business model "is based largely on 'renting' technology equipment that it knows will be obsolete at the end of the Initial Term," that "all roads lead to the evergreen renewal, no matter what the customer does," and that Winthrop goes to great lengths "to bully its customers." (*Id*. at 37–38) (citing *Winthrop Res. Corp. v. Apollo Educ. Grp., Inc.*, No. 17-cv-1448 (DWF/SER), 2017 WL 3531516, at *1 (D. Minn. Aug. 16, 2017)).

Here, the monthly lease charges were levied pursuant to the terms of the Lease Agreement and Lease Schedules, and the evergreen renewal clause is an agreed-upon term as well. "As a matter of law, there cannot be a breach of the duty of good faith when a party simply stands on its rights to require performance of a contract according to its terms." *Warren E. Johnson Cos. v. Unified Brand*, 735 F. Supp. 2d 1099, 1112 (D. Minn. 2010); *see also BancInsure v. Highland Bank*, No. 11-cv-2497 (SRN/JSM), 2013 WL 5340887, at *10 (D. Minn. Sept. 23, 2013) (stating that "a party to a contract does not act in bad faith by asserting or enforcing its legal and contractual rights."). Moreover, under

Minnesota law, the covenant of good faith and fair dealing "governs the parties' performance and prohibits a party from failing to perform for the purpose of thwarting the other party's rights under the contract." *Team Nursing Servs. v. Evangelical Lutheran Good Samaritan Soc'y*, 433 F.3d 637, 641–42 (8th Cir. 2006) (citations omitted). As to the payments that Prospect made beyond the initial terms of the Lease Schedules, Prospect understood that the invoices it was paying "included charges past the initial term." (Bridgman Decl., Ex. 6 (Kahn Dep.) at 116.)

Also, the posture and facts here are unlike those in *Apollo Education*, to which Prospect refers. Procedurally, *Apollo Education* was before the court on a motion to dismiss, with a standard of review that is more favorable to the plaintiff, not a motion for summary judgment, which has a more stringent standard of review. 2017 WL 3531516, at *1. Factually, in *Apollo Education*, the lessee of Winthrop's equipment sought to terminate the parties' lease, and in the process of returning the leased equipment, discovered that approximately 3% of the equipment had been lost. *Id*. The lessee sent Winthrop a check for the fair market value of the lost equipment, which Winthrop refused to accept. *Id.* Instead, Winthrop claimed that the lessee had renewed the entire lease, including the returned equipment, pursuant to the terms of the lease. *Id.* The court denied Winthrop's motion to dismiss the lessee's claim for the breach of the implied covenant of good faith and fair dealing, finding that it had sufficiently pleaded that Winthrop hindered the lessee's efforts to terminate the contract by failing to explain why the lessee's fair market value payment was insufficient. *Id*. at *3. Unlike here, the lessee in *Apollo Education* had attempted to fulfill the termination language of the lease by returning 97% of the equipment

34

and compensating Winthrop for the remainder.  Here, Prospect could have terminated its

payments by providing notice and either returning the equipment, or reporting the lost or

damaged equipment and paying the CLV of the lost equipment.  (Bridgman Decl., Ex. 1

(Lease Agmt.) ¶¶ 1, 7, 12.)  It did not do so.

As to Winthrop's alleged failure to negotiate, the Lease Agreement placed it under

no such duty.  *See Auto-Chlor Sys. of Minn. v. Johnson Diversey*, 328 F. Supp. 2d 980,

1000 n. 9 (D. Minn. 2004) (stating, "The duty of good faith and fair dealing is not

actionable where the alleged 'bad faith' actions involve the performance of terms that are

not part of the contract.").  Prospect made an informal offer to be released from its

obligations under the Lease Agreement when its representative Stewart Kahn "threw out a

number of 50- or a hundred thousand" to Winthrop salesperson Jake Schwamb, (Bridgman

Decl., Ex. 6 (Kahn Dep.) at 282–84), and Prospect's CEO, Michael Veillette, also

exchanged preliminary emails with Schwamb on the subject of a buyout.   (Jan. 22, 2021

Kahn Decl. ¶¶ 20–24.)    The record also reflects that Winthrop provided five separate

written offers.  (Bridgman Decl., Exs. 8–12.)  However, Prospect declined to accept the

offers.  (*See* Bridgman Decl., Ex. 6 (Kahn Dep.) at 280–81.)  The fact that the parties were

unable to negotiate a release does not mean that Winthrop refused to negotiate in good

faith.

### 5.    Breach of Contract

As noted, the parties have asserted breach of contract claims against each other.

Under Minnesota law, a breach of contract claim has four elements: "(1) formation of a

contract; (2) performance by plaintiff of any conditions precedent; (3) a material breach of

the contract by defendant; and (4) damages." *Gen. Mills Operations, LLC v. Five Star Custom Foods, Ltd*., 703 F.3d 1104, 1107 (8th Cir. 2013) (quoting *Parkhill v. Minn. Mut. Life Ins. Co*., 174 F. Supp. 2d 951, 961 (D. Minn. 2000)).

Regarding Plaintiff's breach of contract claim, it contends that Winthrop breached the Lease Agreement and Lease Schedules by not returning the security deposits that Prospect provided, and that "Winthrop is also liable . . . for all excess payments made under the [Lease Agreement and Lease Schedules] once the initial terms under each of the Schedules ended, at which point no further payments were due." (Compl. ¶¶ 85–88.) However, because the Court has determined that the Lease Agreement and Lease Schedules were leases, Winthrop did not breach the agreements. It was not obliged to return the security deposits under the terms of the Lease Agreement, but instead, Prospect was obliged to continue making payments pursuant to the evergreen clause or to inform Winthrop of the lost or damaged equipment and pay its CLV. (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶¶ 1, 7, 12.) Accordingly, Plaintiff's motion for summary judgment on its breach of contract claim is denied.

Turning to Winthrop's counterclaim for breach of contract, it alleges that Prospect committed events of default under the Lease Agreement by "failing and refusing to pay the lease charges and other charges when due, and otherwise failing to meet its obligations under the lease." (Def.'s Counterclaim [Doc. No. 9] ¶¶ 23–27.)

As to the first element of a contract claim—the existence of a contract—the Court finds no disputed issue of material fact that the parties entered into valid contracts. (*See, e.g.*, Bridgman Decl., Exs. 1 (Lease Agmt.) & 3 (Lease Schedules).) Regarding the

performance of any conditions precedent, it is also undisputed that Winthrop provided the equipment and services subject to the Lease Agreement and Lease Schedules, and, in turn, Prospect timely made payments pursuant to those agreements for several years.

As to a material breach, the Lease Agreement unambiguously states that the following events constitute "event[s] of default": (1) "the nonpayment by Lessee of any Lease Charges when due"; (2) "the failure of the Lessee to perform any other term, covenant or condition of this Lease Agreement, any Lease Schedule or any other document"; and (3) the Lessee's performance or attempted performance of removal or parting with the possession of any item of equipment. (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 16.) Among Winthrop's remedies for any events of default, it could "retain any and all security deposits" and also undertake the following actions: (1) recover "all accrued and unpaid Lease Charges"; (2) "retake . . . possession of the Equipment without terminating the Lease Schedule or the Lease Agreement free from claims by Lessee which claims are hereby expressly waived by Lessee"; (3) require the delivery of the Equipment; and (4) seek legal remedies. (*Id*. ¶¶ 17, 26.)

It is undisputed that Prospect ultimately ceased making payments under the terms of the Lease Agreement and Lease Schedules. Prospect's defense for failing to make payments relied on the recharacterization of the agreements, which the Court has denied.

The Lease Agreement gave Prospect termination rights at the end of the initial term, and annually thereafter. (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 1.) By assuming ECHN's contractual rights and obligations, Prospect was aware of its termination rights with Winthrop, and its corporate deponent, Stewart Kahn, testified to Plaintiff's understanding,

stating, "This lease is subject to termination by ECHN or Prospect."[5]  (Bridgman Decl.,

Ex. 6 (Kahn Dep.) at 111.)   Prospect had multiple opportunities to exercise its right of

termination at the end of the initial terms of the Lease Schedules and at the end of the

annual renewal terms.  In fact, in 2018 and 2019, Winthrop contacted Prospect to advise it

of upcoming termination dates and to provide instructions for returning the equipment.

(Bridgman Decl., Ex. 28 (Farris/Pelletier email with return instructions); *id.*, Ex. 29 (Farris

email with return instructions).  However, it is undisputed that Prospect did not return any

of the equipment.

It is also undisputed that Prospect failed to preserve and maintain the equipment,

failed to notify Winthrop that any equipment was lost or destroyed, failed to pay Winthrop

the CLV of the equipment, and has continued to use some of the equipment.  (*See* Bridgman

Decl., Ex. 5 (Fuss Dep.) at 66, 68, 79, 102)   Prospect does not deny any of its actions

concerning the destruction of the equipment, and the lack of termination notice.  In sum, it

is undisputed that Prospect has breached several material terms of the Lease Agreement.

That the terms of the Lease Agreement favored Winthrop is unavailing to Prospect.

In *Med-Depot*, 2012 WL 13027410, at *1, which involved the same automatic renewal

language as here, the court noted that a portion of the leased equipment retained value and

was returnable, and also stated, "Med-Depot itself signed the leases, which included the

---

[5]      Prospect's leasing expert, Paul Bent, also testified that Prospect retained termination
rights under the Lease Agreement, stating, "Can those payments be terminated by Prospect
under certain circumstances, the answer is clearly yes."  (Bridgman Decl., Ex. 21 (Bent
Dep.) at 42.)

very conspicuous provision stating that Med-Depot reaffirmed that Farnam Street could automatically renew the lease if Med-Depot did not properly terminate the lease and return the equipment.  Med-Depot is a sophisticated commercial entity, and must uphold its end of the bargain.  Med-Depot cannot now complain about the provisions it bargained for in the lease." *Id.* at *3.  Here too, Prospect is a sophisticated commercial entity that must be held to the terms of the bargain.

And similar to the plaintiff in *Pacific Space Design Corp. v. PNC Equipment Fin., LLC*, No. 1:13-cv-00460, 2014 WL 6603288, at *5 (S.D. Ohio Nov. 19, 2014), Prospect's "real argument appears to be that interpreting the [Lease] Agreement pursuant to its plain terms would be unfair to Plaintiff."  The court in *Pacific Space Design Corp.* observed that ultimately, "the automatic renewal of the lease worked to Defendant's advantage." *Id.*  But there, as here, "that renewal occurred because of Plaintiff's own failure to act rather than because of a breach of the terms by Defendant.  The Court cannot rewrite the plain terms of the Agreement to remedy a perceived imbalance." *Id.*

Prospect knew of the lease's requirements when it assumed the Lease Agreement and Lease Schedules.  "If [the lessee] did not wish to be bound by the terms of the Lease Agreement that it now claims are unconscionable, it should have negotiated to eliminate those terms from the contract," *Winthrop Res. Corp. v. Applied Card Sys.*, No. 03-cv-4119 (MJD/JGL), 2004 WL 5586135, at *3 (D. Minn. Sept. 21, 2004), or should have taken greater care when it acquired certain Lease Schedules from ECHN.  In fact, as noted, Prospect acknowledges that it leased the equipment from Winthrop instead of buying equipment itself, because leasing was beneficial, either because it "made no sense" for

39

Prospect to own the personal computers at the end of the lease, or because it obtained lower lease payments.   (Bridgman Decl., Ex. 15 (Veillette/Broadbent emails); *id.*, Ex. 23 (Covin/Cerrato emails).)

Finally, as to damages, Prospect does not deny that it ceased making payments to Winthrop and has failed to return the equipment.  There is no question of disputed fact that Winthrop has sustained damages.

Under the Lease Agreement, Winthrop is entitled to "retain any and all security deposits" and to seek other remedies including the recovery of all unpaid lease charges and other amounts due, and acceleration of all lease charges to come due.  (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 17(1)–(3).).   Winthrop's Paul Gendler avers that as of April 20, 2021, Prospect will owe past due rent of $3,397,238.00, along with accelerated rent, discounted at 4%, in the amount of $843,368.97, and unpaid late fees and property taxes in the amount of $583,883.52, for a total of $4,824,490.49.[6]  (Gendler Decl. ¶¶ 24–25, 29–30.)  As an alternative to calculating damages based on accelerated rent, Winthrop notes that the Lease Agreement also permits it to recover the equipment's CLV.  (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 17(3).)  Pursuant to that formulation, Winthrop states that the current "percent of original cost" for the Lease Schedules at issue is 22.4%, yielding a total CLV of $4,922,378.71.  (Gendler Decl. ¶¶ 26–28.)   The Court awards damages based on

---

[6]     In Winthrop's summary judgment memorandum, it calculates total damages based on its accelerated rent methodology in the amount $4,724,490.49.  (Def.'s Mem. at 31) (emphasis added).  This appears to have been in error, by one digit, as $3,397,238.00 + $843,368.97 + $583,883.52 = $4,824,490.49.

Winthrop's calculation of unpaid lease charges and other amounts due, and acceleration of lease charges, in the total amount of $4,824,490.49.

Winthrop also notes that the Lease Agreement calls for the return of the equipment as a form of remedy.  (Bridgman Decl., Ex. 1 (Lease Agmt.) ¶ 17(7).)  The Lease Agreement indeed permits Winthrop to obtain multiple forms of relief, but notes that it may seek such relief "alternatively, successively, and/or concurrently."  (*Id.* ¶ 17.)  Here, as Winthrop is aware, some of the equipment has been destroyed.  Moreover, the Court finds that monetary damages sufficiently compensate Winthrop, and Prospect need not return the equipment, in addition to paying monetary damages.

The Lease Agreement also provides that Winthrop is entitled to obtain attorneys' fees and costs that Winthrop has incurred for any event of default related to the Lease Agreement and Lease Schedules.  (*Id.* ¶ 18.)  Because the Court finds that Prospect breached the Lease Agreement, Winthrop shall file and serve a detailed affidavit and supporting documentation for its attorneys' fees, costs, and expenses.  Plaintiff may respond within ten days thereafter.

In light of the Court's ruling on Defendant's summary judgment motion, it denies as moot Defendant's Motion to Exclude Testimony from Prospect's Expert Paul Bent.

## III.   CONCLUSION

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that

1.  Plaintiff's Motion for Summary Judgment [Doc. No. 77] is **DENIED**;

2.  Defendant's Motion for Summary Judgment [Doc. No. 96] is **GRANTED**;

3. Defendant's Motion to Exclude Testimony from Prospect's Expert Paul Bent [Doc. No. 102] is **DENIED AS MOOT**;

4. Defendant shall recover $4,824,490.49 from Plaintiff;

5. Defendant is entitled to recover attorneys' fees, costs, and expenses incurred as a result of Plaintiff's breach of the Lease Agreement;

6. Within ten days of the date of this Order, Defendant shall file and serve a detailed affidavit and supporting documentation for its attorneys' fees, costs, and expenses.  Plaintiff may respond within ten days thereafter; and

7. This Order is temporarily filed under seal.  Within seven (7) days of the date of this Order, the parties are **ORDERED** to show cause as to why the Order should remain under seal, and if so, which portions of the Order should remain sealed and for how long.  To that end, the parties must file (under seal) a joint brief, no longer than five (5) pages, and/or a proposed Redacted Order, if they would like portions to remain under seal.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: September 29, 2021                                    s/Susan Richard Nelson
                                                            SUSAN RICHARD NELSON
                                                            United States District Judge